Good morning. Good morning. Judge Gould, how are you? Fine, Judge Fischer, thank you for joining. My pleasure. And Judge Tallman, good to see you. The case before us, United States, is Ruehl or Ruehle? Ruehle. Okay. We only have the one case with me involved, so. The clock, as you know, counts down, and then it starts counting up. That's not a grant of digital extra time. That's your overtime. So if you want to reserve time, you may do so, but you'll have to watch the clock. Thank you, Your Honor. May it please the Court, Daniel Levin on behalf of the government. The district court erred when it found the defendant had a personal attorney-client privilege in his communications with a law firm that was hired by his employer to investigate stock option practices at Broadcom. When administering the attorney-client privilege in the corporate context. Can I, just to lay the groundwork, it would be helpful to maybe focus. Do you dispute the district court's finding that Mr. Ruehl had a reasonable expectation that he was being individually represented, and so, therefore, you are disputing whether there's any attorney-client relationship whatsoever? We did dispute that, Your Honor. We're a little bit handicapped because we haven't seen the in-camera records, so it's difficult for me to articulate a response to the evidence that we haven't seen, but we do dispute based on what we've seen in the public record, and it's at page 31 of the brief in a footnote, but based on the public record that there was even a reasonable belief that an individual relationship had formed prior to June 1 of 2006. All right, so when you're making your argument. Can I just get the groundwork here? When you're making your argument, would you distinguish, as you do so, between an assumed dual representation where IRL was representing both the corporation, Broadcom, and Mr. Ruehl, or if your argument depends entirely on rejecting the district court's finding that there was a reasonable expectation on Ruehl's part so that he believed reasonably that he had personal representation from IRL? That would be helpful if you just make those distinctions. And then the second thing I'd like you to keep in mind through your argument is what the effect of or what the law is, if you will, when a law firm undertakes an investigative representation on behalf of a corporate entity and involves the outside auditor as part of the investigation. So whether there's a — if, in other words, under the eight-part test, there's a — and I know in this case there's a dispute as to whether Mr. Ruehl had any expectation of confidentiality, assuming he knew that Ernst & Young would be the recipient, at least Ernst & Young would be the recipient of information gleaned by IRL. Let me address the auditor point, because I think — is Your Honor asking can the privilege encompass the auditor? And there is, I think, some law that a privilege can't extend and an auditor can be part of a privilege, but to the extent that it could exist here, it would be the company's privilege because it's the company's auditor. It's not the defendant's — he doesn't have an individual relationship with Ernst & Young. No, I understand that, but the issue I'm trying to address is whether Mr. Ruehl could have an attorney-client relationship in a dual-representation situation where he knew that the corporation would be disclosing information to its auditor. Does that necessarily vitiate any attorney-client privilege then vis-a-vis him? That's the issue that I — you can address it now or later. I just want to make sure that that's clear. Let me address it now, and I think the answer is yes, it does, because here, when Broadcom is communicating with the auditor, it's for the purpose of public disclosure. This is — it's not — this isn't a question of bringing the auditor into the privilege relationship for the purpose of preparing for litigation or something of that nature. It's for the purpose of satisfying the company's reporting requirements to the public market. So when the Audit Committee meets in May and retains IRL through this investigation, the — it has a duty under Federal law to get straight with its auditor. There have been allegations that there's a problem with stock options, and it needs to have Ernst & Young's confidence in its financials. And ultimately, there was obviously a large restatement here. But the point of the communications with E&Y are to satisfy his reporting obligations to the public market. So it's not part of a confidential litigation relationship. Is your argument, Mr. Levin, that at the time the interview occurred, Mr. Rooley could not have had an expectation in the confidentiality of the communication because he knew that it was going to be disclosed to Ernst & Young for the purposes of — That is an independent ground on which the district court erred. It's one of our arguments here, that when he sat down at that meeting and he testified, he knew that factual information was going to E&Y. And he knew that the purpose of IRL's retention, whatever else he may have thought about personal representation, that they'd been retained to do this investigation and figure out what was going on with the company's financials, essentially. And that that information was going to be — had to be shared with E&Y and was going to be — Here's the problem I'm having. You're saying that the corporation could maintain its attorney-client privilege if it retained IRL. The audit committee retained IRL to do an investigation. You say it wasn't in anticipation of litigation. I'm not so sure that's clear. But in any event, if the corporation, Broadcom, could retain IRL's outside counsel so that it could discharge its duty to its shareholders and to the SEC and to the auditors and everybody else that it had to and could include in the chain of communication between IRL and Broadcom management, could include, without losing its attorney-client privilege, could include the outside auditor, do you concede that or not? No. I didn't mean to suggest — if Broadcom, and I think here it would, had the same expectation, that the communications with the auditor are not part of the privilege, to the extent that privileges always have to be communication by communication. So it's not to say there is no corporate privilege at all over any — No, but if you're saying that as soon as Broadcom retained IRL and knew that IRL would communicate the results of its investigation to Ernst & Young, then at that point it didn't have a valid attorney-client privilege either. No, that's not what I meant to suggest, Your Honor. What I meant to suggest is individual pieces of information that the company, through its agents, understood were going to be disclosed. Those aren't privileged because they're not intended to be confidential. That's the extent of the confidentiality inquiry. It's not a sort of broad brush that the entire nature of this — Well, I mean, for practical purposes, Broadcom wants its lawyers to be able to ask intelligent questions to find out whether there has been any breaches of law or duty, and it wants the lawyers to be able to evaluate that information with the assistance of its outside auditors who will be able to advise IRL, who are not accountants. And so I'm having a little trouble understanding the line you're drawing. You're just saying, well, it's specific to the communication. But the whole purpose of the investigation was to advise Broadcom about whether there were legal violations with the anticipation that there would be communications to its auditors as well. And you're saying that as IRL undertook that investigation, Broadcom had to understand that anything IRL found through its communications that would be damaging to the corporation but would have to be disclosed to the auditors would, from the get-go, not be privileged. Is that your position? Our position is that information which people understood at the time the communication occurred, and I think that's a distinction, because there's a distinction between, obviously, lawyers gather information and then later on it comes out in pleadings, it comes out in court, and that information, the gathering of it is privileged. But if at the time the information is gathered, the individual who essentially is the corporation in that meeting understands that the information is on its way to outside party, a third party, it doesn't meet the task for confidentiality. Outside third party is too gentle. I want to know about the law with respect to the regular auditor with whom the corporation necessarily must communicate the results of its investigation, as you yourself acknowledge. Right. I think that to E&Y would be. If it knows that this information is going to E&Y. And that as to any information that gets communicated by the attorneys in the course of that investigation, that information is not privileged. If at the time... That's a waiver or a selective waiver or whatever. Well, it's not a waiver. It's if the privilege doesn't arise. Well, it does arise. It's there until it's disclosed, right? They don't know which pieces of information in the course of their investigation are going to be part of the reporting. They just know that some of it will be. I'll give you some time. If they don't know at the time what's going to be, if it's going to be disclosed, then it doesn't, it's not, there's not an understanding that it's going to be disclosed, and therefore it would meet the confidentiality requirement. But if they know, I'm talking to my lawyer for the purpose of a disclosure to E&Y, for the purpose of informing the markets about what's going on, at that point there's no confidentiality and there's no privilege. It's not simply a waiver. It's simply the confidentiality requirement for privilege hasn't been satisfied. Are you aware of any cases that rule on this? Well, yes. I mean, we say it can be. On the audit, specifically question the outside auditor in these corporate investigations. The court case in the Eighth Circuit, which we cite in our brief, is an auditor case. But I don't think, the other ones are not specific to the auditor. Okay. Judge Gould had a question that I cut him off on, so. Well, I was just hoping at some point in your argument, you'd be clear to distinguish between arguments by the government that really did not have any attorney-client relation, which seems contradicted by a lot of evidence, as contrasted with arguments that his specific statements during this investigation to these lawyers were not intended to be confidential because of the auditor disclosure that was contemplated. But if it's the latter point, I'd like you, at some point in your argument, to address the standard by which we could assess whether he intended the statements to be confidential, when we have a setting where it makes it clear there's a disclosure to the auditor contemplated, but we have an express finding by the district court that he intended it to be confidential. So I guess we're in a clearly, on that issue, there's a clearly erroneous, the issue is whether the finding's clearly erroneous. Anyway, those are my concerns. Your Honor, let me address that last point, if I may, about the standard. Because the district court reached a legal conclusion it was confidential, and it made a finding that the defendant understood, it's on page 17 of the order, that the third, that his statements would not go to a third party. And that ultimately confidentialized a mixed question of law and fact, and it relies on, here we think the district court made at least two legal errors. First, it focused excessively, I think, on whether the information was going to go to the government as opposed to any third party. It doesn't have, it's not the ultimate recipient, but it's the fact that it's a recipient. And the other problem is, and I think it's a particular problem with respect to the finding about third parties, is the district court says, and it's on page 15 of the order, that there's a presumption of confidentiality, and it cites the California evidence code provision. And that's, that is the law of California, but it's not the Federal law of privilege. There is no presumption of confidentiality. The defendant has the burden. And then when the defendant, excuse me, when the district court gets around to making its finding that the defendant understood that no third party would get it, he cites a page of the transcript, in this case 76 of the last day of the hearing, and he cites a particular segment of it, and it's a segment where the defendant says, Irel didn't tell me in the June 1st meeting that these statements were going to E&Y. And that may be salient if there's a presumption of confidentiality, then you need maybe some warning to overcome that presumption. But because there is no presumption, I don't think the warning is all that important or the lack of that warning is all that important. What you have is an understanding walking into the meeting about what's going on with the information. And the defendant testified that he understood factual information was going to E&Y. And he testified expressly that Broadcom was not withholding information from its auditor. And of course, it wasn't. It's not allowed to do that. And the defendant knew that. But let me move on, if I may, to the broader point, which I think is important here, which is I think what the district court missed in its analysis is the need to understand when a corporation hires an attorney, that attorney, to do its job, has to talk to the company's agents, has to talk to the people at the company because they're the repositories of information. And on the flip side, those people, in particular the Section 16 officers, have a fiduciary duty to talk to the lawyers. And it's that concern, what the Supreme Court called the special problem of administering the attorney-client privilege, that led really every circuit that's looked at this to say you need to look at it through a fine lens. And they've set out the bevel factors. And the Third Circuit and other circuits have used some or all of them. There's no circuit that I'm aware that has looked at this question and rejected that analysis. It's because the analysis takes into account the basic fact of how corporate representation works, which is the lawyers have to be able to talk to the corporation's agents and understand and gather information which essentially belongs to the company and the repositories of that information are people like the chief financial officer. So you have here, even assuming, and of course in bevel itself, there was an individual attorney-client privilege perspective, some of the defendant's individual statements in that case. Even assuming that there was some kind of attorney-client, personal attorney-client relationship that had formed here, that doesn't really answer the question. You have to look at the nature of these communications. Was the defendant communicating in his capacity as a fiduciary about company affairs? It's that final prong of the bevel analysis. In that prong, are you talking about information that's within the company, the company's affairs? That's exactly what this Court looked at in the Martin case, in the Met case, that distinction. It's that analysis the district court here didn't do at all. And so for that reason, it needs to go back to the district court. Would you concede, as Bevel suggests, that if there were in the course of the interviews or the communications information specific to Mr. Rooley's personal liability vis-à-vis this whole, these general issues of backdating, and he clearly was intending to communicate that to Eirell only because they were acting as his lawyers as part of this, would it be possible to parse out those communications as privileged? I think that could be done. I think that is what the bevel – bevel is just a set of tools, and I think it's – that's what those tools are designed to accomplish. But doesn't Bevel say that the claimant has the obligation to identify what portions of his communication were privileged, and was that done here? Well, I don't want to get into the statements from the public record, but there's – there is evidence here in the public record that the civil – the civil litigation topic of it didn't come up, and that the defendant didn't ask for legal advice. But the defendant has to say – and look at the Met case as an example. There was a request from those individuals to the lawyers, are we facing criminal and civil liability? And the lawyers wrote back a memo saying here's your criminal exposure, here's your individual civil exposure. That would meet the Bevel test. There's been a request, there's been information about personal liability that's been imparted. That – there can be an individual privilege there. If it's just talking about what a corporate officer did as a fiduciary of the company, did the company grant stock options on such and such a date, what was the process for doing so, things like that, that's the company's information. The defendant just doesn't own that information. And that's what Bevel's focused on. Without that information, take the counterfactual, the company's lawyer just can't do its job. So that's why I think Dr. Bronstein's circuit. Counsel, counsel, so I have a question for you. I might have misread Bevel, but it seemed to me that part of what it was saying was that to have a separate confidential individual communication, the subject matter would have to be something segregable from or separate from what the corporation was concerned about. If I'm right about that, then Mr. Rulli couldn't necessarily claim privilege if he said things that were specifically related to his own conduct if those things also would create a corporate liability. I think that is true. Bevel says that, and I think that's true. He says, and I think the problem is you have to ultimately look at the communication. I don't think it's impossible to get an individual privilege under Bevel, but I think it is hard. And I think it does have to be distinct from the corporation's affairs. And that's because he is, at the time, he is the CFO of the company. And the company has to be able to talk to him in order for its lawyers to be able to do their jobs. Mr. Levin, let's take this hypothetical, and I'm not drawing it from the record in this case. Suppose that the officer in the middle of the interview says to the corporate lawyers, look, guys, I'm about to tell you what I did, but I have some real concern before I disclose my role here that I might be civilly or criminally liable for the following. Would you agree that at that point in the interview, the employee was essentially seeking legal advice as to whether or not he might have exposure? I think, yes, I would agree with that. I think it doesn't, I wouldn't say that it's so strict that it has to be, there's a magic word requirement. I think if from the context it is apparent, and I think your question puts it that way, that that would be enough to satisfy that request for advice. When someone says, I think I'm in trouble here personally, what's the issue? How would it be segregable? Let me just ask one follow-up. How would, in Judge Talman's question, it be segregable from the company's liability? The communications, I think the segregability would go, and I don't, the segregability would go to conversations that were about is personal liability of the individual. Now, in a sense, directly about that, in a sense of is there jail exposure, is there civil fine, personal civil fine exposure. To the extent it's just generally talking about the company's business, which might have some, also have an effect on the individual's personal liability, that doesn't satisfy it. And that's because in that sort of neutral middle ground, it is because the person is the company employee, they're meeting with the company lawyer and know it. So it's the company's privilege. So your position is, if I understand what you said in answer to my earlier question, if the company's lawyer simply come in and ask the corporate officer, what did you do, and he doesn't indicate any concern whatsoever as to whether or not what he's about to say may expose him to potential liability, as long as those questions are within the course and scope of his employment and related to his Section 16 duties, the government's position is that can't be privileged under, even if he has an attorney-client privilege with these lawyers. That's the government's position, yes. So your answer then to Judge Talman's hypothetical was if he says, I'm about to tell you something that may expose me to criminal and civil liability, then the response of the attorney would be, I'm sorry, but that won't be privileged because if you're exposing the corporation to liability through your answers, that wouldn't be privileged because that would be the corporation's right to know. I think what should happen there, and I think we haven't focused much, but the third devil factor is that the corporation has to agree to, excuse me, the law firm has to agree to, you know, give this advice. What should happen there is when he is, let's stop for a minute. You need to get a separate counsel. Okay. A separate counsel. All right. Okay. I've given you extra time. I'll let the other side have the equivalent. You can have a couple minutes on rebuttal. Good morning, and may it please the Court. Matthew Umhofer on behalf of Mr. Wooley. What's been missing from the conversation thus far and what the government has ignored is the most important factor that the district court found, which was that five days before, five, six days before the June 1 meeting, Mr. Wooley was sued. Mr. Wooley was sued in two different cases. IRL was representing Mr. Wooley in those two different cases, so we need to reorient a bit and not talk about an internal investigation occurring in a vacuum. What happened on June 1st was that Mr. Wooley's attorneys, who were actively representing him in civil litigation and who had represented him in just the same kind of litigation, which had just concluded, walked into his office. One of those attorneys was an attorney who represented him in a deposition just a few years before, personally represented him in a deposition. Well, but wait a minute. This isn't just some hazy who, you know, fell off the turnip truck on the way to the office building. He's a CFO. Of course. He was part of the audit committee decision to retain IRL before the suits were filed, right? That's correct. The audit committee retained IRL as outside investigative counsel on behalf of the corporation with Mr. Wooley present at that meeting, correct? That is correct. Okay. So when an IRL attorney that he knows and had a relationship with because they had a longstanding relationship with Broadcom, this wasn't just some guy who showed up in his office. And indeed, wasn't he asked if he could meet with them? Two days before that happened, the e-mails that are under seal in this case happened. Yes. In which Mr. Wooley received information that the district court read, considered, and considered in light of Mr. Wooley's testimony, which it found credible. And Mr. Wooley said the purpose of that meeting, and I refer the court to SCR 128 in this regard, the purpose of this meeting was that so IRL could gather facts to represent his clients. Who were their clients? And Mr. Wooley said, I'm one of those clients. Wait a minute. Wait a minute. Okay. I'm trying to understand what you just said because IRL was retained to conduct an investigation, the back dating stuff that was in the media. That's correct. And IRL, this is probably not the first investigation Broadcom had gone through, but in any event even assuming it was, the idea was that IRL was outside counsel. It was coming in to advise the audit committee and it was going to be talking to various individuals involved in the corporation activities that would provide IRL information to advise the audit committee about any problems Broadcom might be confronting. Isn't that correct? That is one of the reasons they were brought in. The other reason they were brought in was to represent Broadcom. When? Broadcom and Mr. Rooley had just been sued. When? When was IRL brought in? I think you'd have to look at the sealed e-mails to get the answer to that. All right. But at the time? It was communicated to Mr. Rooley. At the time they were sued, within a day, it was communicated to Mr. Rooley. That IRL was going to represent. Mr. Umhofer, suppose that the lawyers had brought an Ernst & Young auditor into the interview room on June 1st to listen to what the CFO had to say. Would you agree that had an outside auditor been present, there would have been, as a matter of law, no confidentiality that attended that meeting, that interview? I would agree with that. And I think that one of the best ways to look about, to think about what happened on June 1 is what if Mr. Rooley there that day met with his own attorneys, separate from Broadcom, his own independent attorneys, and he'd just been sued, so he's talking to his attorneys about his liability, about the facts of the case. IRL doesn't get that. Broadcom doesn't get that. E&Y doesn't get that. It's his privileged communications with his own attorneys. That's what was happening that day, and that's what the district court found. No, that's not quite what the district court found. What the district court found was that, based on the e-mails, that Mr. Rooley had a reasonable expectation. But I don't know where's the find ñ point me to the finding where the district court found that this, the purpose of this meeting was to get information specifically from Mr. Rooley, specific to the civil case that had been filed at that point. Can you cite me to anything, any finding of the district court? Two answers to that. On the third day of the hearing, I'm sorry I don't have the page number in my mind, but on the third day of the hearing, the district court stopped the questioning of the government and says, I'm prepared to find that Mr. Rooley actually had an attorney-client relationship with IRL in those civil cases. That's not my question. My question was, per your statement, that the district court found, and that's important because we have to decide what deference we're giving to factual findings of the district court as opposed to legal questions. So where in the record did the district court find that the purpose of the meeting was joint to IRL to find out information from Mr. Rooley with respect to the civil case? The district court found that the purpose of the meeting was joint to IRL to find out information from Mr. Rooley with respect to the civil case. So where in the record did the district court find that the purpose of the meeting was joint to IRL to find out information from Mr. Rooley with respect to the civil case?  Mr. Rooley did not find evidence that there was a liquidation involved.  Receiving communications while there was an attorney-to-court relationship existed. And he goes through at that point the communication strips and the issues where they were facing. You're in the district court's order. In the district court's order. And I'm sorry, could you ---- Ages 8 through 9. Are you talking about the numbered page or the VRB?  The numbered page is the one that begins at the middle of page 9. He testified that he believed the interviews were being conducted for the purpose of gathering information in preparation for the litigations. That's his belief. That's correct. That's his belief. That's correct. And that's a factual finding, that his belief in the district court ---- the district court applying the reasonable belief standard. But there's no finding that Irell represented that to him. I'm sorry? There's no ---- Well, of course not. There's no finding that Irell ---- No. No, of course not. And I ---- forgive me if I suggested that Irell walked into the room and said, we're going to talk about the litigation now. But what Irell did testify to and what both ---- what Mr. Heitz testified to was he couldn't split his brain between the facts relevant to the internal investigation and the facts relevant to the civil litigation that was going on. And both Mr. Heitz and Mr. Loeffler conceded the facts that they were talking about were identically related to both the internal investigations. But what's confusing you, Mr. Inhofer, is your client testified that as a result of attending the audit committee meetings, he understood that facts would have to be disclosed to the outside auditors in order to determine whether or not an amendment to the financials would be necessary as a result of whatever that factual investigation revealed. And that audit committee meeting immediately preceded the June 1 interview. So why, in light of your client's admission, is it correct for the district court to rule that he had no expectation that any of this information would be disclosed without his permission, when the whole purpose of the interview was to gather information that was to be disclosed to the auditor? Again, I've got to disagree with one premise, Judge Coleman, which is that the whole purpose of the interview was to gather it for the audit investigation. The purpose, as Mr. Rooley understood it and testified, and the district court credited this testimony, was that the purpose of the interview, and we just read that part of his order, was to obtain facts relevant to the civil litigation. No, that's not what the district court said. Now, be careful. What the district court found was that may have been one of the purposes, but that was not the only purpose. Correct. And I'm sorry if I suggested otherwise. I was trying to make the point that there was more than one purpose to this interview, but the district court focused on two aspects of this. First, that the facts discussed were indistinguishable between the facts were relevant to both, and that neither the lawyers nor Mr. Rooley could split their minds to distinguish Right. Now, given that state of reality, Judge Tolman's question is, if Mr. Rooley knew that the facts that were generated by the conversations with Mr. Rooley would be communicated in some fashion to the outside auditors, where there's no way to split their minds, are you suggesting that he still had an expectation of confidentiality, notwithstanding you just now said, neither he nor the lawyers could split their minds and segregate the statements? No, because he testified specifically and twice that he did not anticipate his privileged information being turned over. He never says at any point, I expected anything that I said to Irell to be turned over. In fact, if you look at the end, the most telling piece of information in the record on this is the end of Mr. Rooley's testimony under seal in camera, which has now been unsealed by order of the court so I can talk about it. Mr. Rooley, the district court took over the questioning at the end of his testimony and said, Mr. Rooley, when did you first learn that Irell had told you this? I have no information to Ernst & Young, said December. He said sometime in 2008, excuse me. And then the district court said, what was your reaction? Mr. Rooley said, I was shocked. Well, counsel, that's all very well and good, but look, this man is the CFO of the company and I come back to the initial starting point of this retention. He was part of the process by which Broadcom retained Irell to do an investigation on behalf of the corporation and the audit committee. Then he got added to the mix. But if you're standing here saying that because he went into a meeting with Irell as counsel and was talking both with his corporate hat on and with his individual hat on and nobody could distinguish between what he was answering as to whether it was with the corporate hat or with the individual hat, and he knew, wearing the corporate hat, that the information he was providing Irell was for purposes of communicating to the outside auditors, how are you able to say that the district court can credit Mr. Rooley that, well, he was shocked to learn that some of the things that he said in these meetings were communicated to the outside auditor? What did he think? How did he think? If you say they can't make the distinctions, what did he think was going to come out of these meetings? That's the point. I think you hit on the point, which is, and I think the government has done a remarkable job at suggesting that Mr. Rooley actually intended what he said to be turned over to the auditors. A client can talk to his lawyer and the corporation can have conversations with their lawyer about strategy with respect to the internal audit committee and the internal investigation without that ever being turned over to Ernst & Young. You know these abstractions, the government and you are dealing at the high level of abstraction. These are very specific investigations. They are very specific to the people that they need to talk to. That's right. Your client is the CFO. The issue relates to backdating. So when you're talking about, I mean, the CFO is the fellow who has the, in this case, has the primary relationship with the outside auditors normally. So as I understand, he's the one that introduced IRL to the E&Y auditors because he knew them. He had every expectation that the information he was giving was going to be part of the information that IRL developed on behalf of the audit committee, that some of that had to find its way into communications with the E&Y. See, and there's two pieces to that. I think first, he did not expect that what he testified, that he did not expect that what he told IRL would be turned over to Ernst & Young. And the district court credited that testimony. And it wasn't clear for the district court to do so. So your position, I think, as I understand it, is he was totally candid with IRL because he believed them to be his lawyers. He trusted them that they would not reveal anything that he told them on the June 1 interview if it was incriminating as to him because they had an obligation to look out for him. Not only that, but he had no expectation that anything he told IRL would be turned over directly to the auditors attributed to him. Well, that's not what the record shows. The record shows that he admitted that he knew that the information would be turned over. I don't see anything either in the sealed or the unsealed record that is as specific as what you just represented. But let me ask you another question. Why is this any different from the situation that we face with public employees? And I have in mind the Supreme Court cases of Garrity v. New Jersey and Murphy v. the Waterfront Commission, where we have a right to expect that public officers within the course and scope of their employment must cooperate with an investigation and answer questions related to what they did. It seems to me that Sarbanes-Oxley creates the same type of obligation on the part of Section 16 officers when they're being interviewed with regard to their actions, as in this case the chief financial officer of the company. Don't they have an obligation to reveal these facts, even if it might violate their Fifth or Sixth Amendment? I think that really takes us into this Court's decision in the United States v. Met, where there was a fiduciary responsibility. The ERISA trustees had a fiduciary responsibility, much like you've just described, to the ERISA trust, to the beneficiaries of the trust. This Court specifically rejected the notion of a fiduciary exception to the attorney-client privilege, even though it's quite a substantial fiduciary duty under those circumstances. And this Court specifically held in Met that fiduciary duty doesn't trump the privilege. In fact, it creates an exception that would swallow the privilege whole. At the end of the day, Mr. Wooley, again, if he's meeting with his own attorneys at that time, nobody gets that information. That's the lens through which the district court, after having sat through three days of an evidentiary hearing, listening to all the testimony and crediting Mr. Wooley's testimony and actually making adverse credibility findings as to the IRL attorneys. That's the conclusion the district court reached, is that this is closer to that situation than the situation you might be describing. So I think that any responsibility Mr. Wooley has to the shareholders is really trumped by Met in this circumstance. And because Met clearly holds that even if you've got a duty to give it, you've still got a privilege, and the privilege wins. All right. You have characterized the ruling by the district court here as a ruling suppressing or granting a suppression of evidence. Isn't it more accurate to describe this as simply granting a motion in limine, which precludes the evidence, the direct evidence, from Mr. Wooley's lips as protected by the attorney-client privilege? But what about why should the government be penalized when it has done nothing wrong other than to receive information that was voluntarily disclosed to it by the company? Well, it's interesting that you note that. There was no actual motion that was filed. Well, the government noted it up for asking for a ruling, which I view as akin to would you please rule on a motion in limine that we anticipate the defense is going to lay out. I think that's right. And we did. And whether you characterize it as a motion to suppress or a motion in limine, look, the purpose of the privilege is sacred. It really is, and the Supreme Court has written very eloquently. In fact, I think the district court did eloquently about how important the privilege is. But would you agree that even if the privilege applies, we don't apply a fruit of the poisonous tree analysis to preclude the government from using any leads or any other evidence that may have been obtained as a result of whatever Mr. Ruley told his lawyers? I can't concede that, Your Honor, because I think that there is substantial case law, which we haven't briefed here, which I'm happy to provide to the Court, that indicates that courts have, in fact, applied the fruit of the poisonous tree doctrine and the notion of taint to privilege issues and even breaches of confidentiality. And we actually briefed that before the case. But you really are getting into a Fourth Amendment suppression analysis, not the invocation of an evidentiary privilege, aren't you, client? Aren't you, counsel? Well, we're – I mean, we have taken the position that a Castigar-like hearing will be necessary as a result of what happened. I just don't see how you get there if this is not an order of suppression under the Fourth Amendment. This is an order granting an evidentiary privilege under the rules of evidence, arguably to protect Sixth Amendment right to the effective assistance of counsel, but it is not addressing misconduct on the part of the government, which would then trigger both suppression of the evidence and suppression of the fruit of the poisonous tree. And this has been the discussion among several courts of appeals, and some have, both courts of appeals and district courts, held that Castigar-like hearings are appropriate in the privileged setting and not limited only to the Fourth Amendment situation. Even in the face of a statutory obligation to disclose to the public market accurate financial information with regard to the affairs of a publicly traded company? I'm not certain that those particular facts are involved in those other cases, but – But that's what we're looking at here. Right. It is. But I would note that with the Fourth Amendment, what you're really doing is trying to deter government conduct. With the privilege, the first priority is just preserving the privilege. Mr. Rooley, if he did, and we firmly believe and the district court found that he did, talked with his own attorneys on that day in ways that he wouldn't have if he knew that they were going to be turning things over to somebody else. That's a sacred privilege that shouldn't be – and we're not even in deterrence lane at this point. We're just trying to preserve his privilege. And so for that reason, there's a difference. Basically, what you're trying to do is recall uttered words. The thing was out the barn door. You didn't have a chance to stop it at the time. So now you're saying if we – if they had called the IRL attorneys to the stand during the course of the trial and the question were posed, what did Mr. Rooley say, your motion would be objection, protected by the attorney-client privilege, and it would have been foreclosed. So since IRL, according to your theory, you know, either inadvertently or intentionally disclosed the privilege information, all you can do is bring it back by way of suppressing it. Is that – And I think that's exactly it. And I think that the Court in Upjohn put it best. And this Court, I think, has repeated that several times. We're only asking for the government to be in no worse position but no better position than that the communications had never existed. So the purpose of what we're asking for here is solely to return to the status quo, which is the government should never have had this, as the district court found. Well, you really are asking then for a Casagar analysis, because if you want us to return the parties to the status quo, we have to know a whole lot more than we can see in this record about what use the government has made since the company made the disclosure. And we've – and I don't disagree that that's something that we need to go back to the district court and do, depending on what's happened here. Right now, we're just trying to keep Mr. Wooley's former attorneys from testifying against him at trial and telling – to the jury what he told them in confidence. That's all we're asking. Counsel, Judge Gould, I have a practical question. You know, this case raises several major issues, obviously, that are fairly new in our law. One of them, the significance of planned disclosure to the accountant for the confidentiality. Another, whether we should adopt the Bevel standard. And still another, these suppression issues. So my practical question is, I think we've expedited the hearing in this, but is there any practical reason, if we wanted to do so, that we couldn't put out an order permitting amicus briefing from the pertinent organizations, like the defense lawyers organization or the prosecutors organization or the relevant ABA committees in the section of litigation to address a set of these issues? I see no reason why that wouldn't be helpful. Although, you know, from our perspective, you know, if it's a hard – if it's a hard case, it should be resolved in favor of disclosure. And so while – and we would submit that this isn't a particularly hard case, but if it is, it should be resolved in favor of the privilege. We wouldn't object to additional views being heard by the court on this issue at all. You've got a December trial date? October. October 20th. I would like – I know we've spent a lot of time in the confidentiality piece. If I could just briefly address the bevel and the new parent issue before I sit down. The crux of the argument that the government is making is that the government – is that the district court applied the wrong standard, a standard that this court has never applied. The bevel and the new parent standards – first of all, the government rides bevel as long as it can, but when it runs up against the fact that bevel permits privilege where there's a joint defense, it abandons bevel. So there is a joint defense here. Mr. Wooley was in a meeting with attorneys that were representing him and another – and Broadcom, and it was a joint client, joint defense situation. So even with bevel, we went – Yeah, where's the finding of that? The district court held, and I would prefer – if you could search the transcript again, I don't have – But the district court specifically said there is a dual representation. Well, that's something different. That's not a joint defense agreement, counsel. That's joint – I'm sorry. That's a joint client situation, which is still – There is a technical distinction, as you well know, between a joint defense agreement and dual representation. And I've never heard the argument made that the same lawyer representing two clients is engaged in a joint defense. That's a novel argument. Actually, that isn't. And I point the Court to the cases we've cited in terms of joint client, which is the notion that in the same matter where one attorney represents two – in fact, this Court was – But the logical extension of your argument is that then both clients have to be able to control the waiver. That's exactly it. Right? And that's – and there's case law that goes both ways on that, as to whether or not the corporation's privilege in this case might trump an individual who otherwise objects. That's really Newparent. That's – and Newparent is really the only case that I can see that's gone that far, which is where there's actually a joint defense, common interest, joint client situation. You're just persuading us that this was an easy case. It's far from the truth. I apologize, Your Honor. You know, at the end of the day – and I'll sit down at this point. The district court made a very, you know, sort of observation, which is that he was concerned that this was your own lawyer who's loading the gun with the bullets. And that's really what happened here. Mr. Rui had a long-time association with IRL. He walked into that meeting believing he was talking to his attorneys. And now the government wants to put those attorneys to testify against him as to what he told them in confidence. The district court's factual findings are clear, I think, and they're supported by the record and there was no clear evidence. Counsel, before you sit down, what do we do with the fact that the district court did seem to be animated by California attorney-client privilege? Isn't this covered by federal common law privilege of attorney-client, which is different from California? I wanted to address that. On the note of the California statute that they cited, which was a presumption, I'd ask the court to look at a case – They, the district court. The district court. Which I assume you cited to the district court and convinced – Actually, we did not. Actually, we did not. This was the district court's own novel analysis. I would point this court to a case the government cited, which is Chen. United States v. Chen. And I just want to make – Well, which is it? I mean, do you agree with me that this is a federal common law? It is a federal common law issue, but there's plenty of case law that suggests that one can look to state law to inform one's understanding of what federal common law is. The problem is that Bevel, if that is an accurate recitation of the federal standard in this area, would, it seems to me, mandate a different result than what the California provision would mandate. Actually, it wouldn't, and here's why. In Chen, this court specifically noted the following. Let me just find it. In Chen, this is what the court said. A matter committed to a legal advisor is prima facie committed so for the sake of legal advice and is therefore within the privilege unless it clearly appears to be lacking in aspects requiring legal advice. So this court, even in Chen, has suggested that when you're talking to your lawyer, it's presumptively privileged. That's what this court has held. It's no different from what happened in California. Thank you. Thank you. You may have a couple of minutes. Just briefly. Counsel, if you could, maybe Judge Fisher would add 10 seconds on this point. If you could just at some point in your argument address the practical question I posed, which is whether there's any practical reason we couldn't permit the NACDL and the Prosecutors Association or the ABA, any pertinent committee, brief the, as amicus, the novel issues presented. The court obviously has the authority to do that, and if it wants that sort of advice. I would say the trial bill is coming up, so we do have a practical issue with that. It's on October 20th. But I think here, I'm not sure that that sort of briefing is necessary because there's not really a major dispute out there among the courts. Every court that's looked at this has used Bevel in some form or another or has stopped because he couldn't even find a subjectively, even a reasonable explication that it was the individual lawyer, so it hasn't had to get there. But the reason all these circuits, and these are circuits like the second and third that have a lot of corporate law experience, the reason they've used this test is because it's consistent with the reality of the situation, that when a lawyer goes in to talk to a corporate officer, that corporate officer isn't open to them not to talk to the company's lawyer. They don't have the option to say, well, I'm only going to talk to you about some things. And they can walk away. They can walk away from the company, and that's the end of it. But what they can't do is come in and sit down and say, I'm going to talk about some of the things I did in my official capacity as an officer of the company, but I don't want to talk about other things. And that's because they are, for all intents and purposes, the corporation. And the corporation has to be able to get here, talking about backdating, has to be able to talk to the CFO. And it doesn't make sense for the CFO to be able to say, oh, I thought you would use other people's information but not my information. Well, I thought you just said on your opening that it was possible if he said, I'm going to now tell you something that exposes me to civil or criminal liability. And you said, as I understood it, was that at that point he could do that and that would be privileged. If the law firm says, the lawyer says, okay, go ahead, because now we're talking about the individual. And I'm not saying it's an easy line. It's not. It's a fine look. It can't be easy because it's shifting around all morning. But with respect, I don't think it's shifting. I think this is exactly. It is. How can, I mean, do you disagree with counsel's, I think it's a concession. There's no way that the lawyer and ruler could have effectively parsed on the subject matter that was being discussed in this investigation between what might affect him personally and have no implication for the corporation and which would be pure corporation. I mean, it's going to be fuzzy as all get out. There's obviously an overlap. When you're talking factually about information, could that bear on his personal liability? Of course. But is that factual information his personal factual information that he controls? No, it's factual information here that he knows by virtue of his authority as the CFO. He doesn't own that information. The company does. If he wants to keep it secret, he can walk away and say it. But if he wants to stay as chief financial officer, it's not open to him to keep that secret from the audit committee. You can't have a situation, a rule that says officers can keep secret information about what they did in their capacity as officers from the board. That just doesn't work. You have a real breakdown in governance. So I think it's that concern that animates these other circuits. So the only choice he has at that point is to say I'd love to cooperate with you, but without adequate assurances that what I say won't ever be disclosed and used against me. I'm not going to answer your questions. And then the company says then you're fired for failing to cooperate with our investigation. You could, I mean, go down that. And I do think that you could. You could. That's how I think it could play out. Yes. Okay. Thank you. All right. Counsel, thank you. It's a very interesting, albeit simple case that we've been told. Now, as a serious matter, although we like to consider ourselves efficient and speedy, if you have an October trial date, regardless of amicus briefing, what happens if you don't get an opinion from this court before your October trial date? Well, I think as a practical matter, we have an order from the district court that we have to abide by. But I think what we ask is that the staff support could even issue an order and have the written opinion say follow up. That could be done prior to the trial date. I don't think we need it hugely prior. The government could be prepared. What's the, what date is, what's the trial date? October 28th. Okay. Oh, yes, you said so. And from Mr. Lewis' perspective here on this trial, this case was indicted in June of last year. If they continue to have this far of affirmative convenience, it certainly isn't going to hurt anybody. There's nothing magical about October 28th. We'd probably be seeking an opinion before the district court if there wasn't an opinion sufficiently advanced. So you would jointly move and you would be willing to waive speedy trial rights? Well, yes, we would jointly move. Your Honor, I'm not on the trial team, but the government would be very reluctant to move, in part because the co-defendant's trial is now scheduled for February, so we're going to push it to that. It's going to be a problem. I don't know whether he'd waive it. I think we understand. Yeah. All right. Thank you. The case just argued is submitted and will be in recess. Thank you. Kathy, I'll get my robot. I'll just leave the papers up here.
judges: Fisher, Gould, Tallman